Three cases this morning and the first one is number 14-1743 Duquesne Light Holdings Inc et al. The Commissioner of Internal Revenue, Messrs. Martin and Cattaraugh. Good morning, your honors. James Martin, may it please the court. I'm arguing for appellant Duquesne Light and with the court's permission, I'd like to reserve three minutes of my time. That's fine, absolutely fine. Your honors, as you know, we've advanced several errors for reversal in this case and I would like... Let me just start. Does... I'm not sure whether to start with the facts or the law, but let me start maybe backwards. Ilfeld is still good law, is it not? Yes, it is, your honor. And your argument that it doesn't apply here is because there was something that in effect overruled it by virtue of either a statute or a regulation. Is that correct? I think that it actually starts... The Rite-Aid decision? Well, Rite-Aid overruled the regulation in 01, right? Yes. That existed up until 01? Well, Rite-Aid, yes. Rite-Aid voided parts of the regulations that applied to duplicated losses for consolidated taxpayers. And then the temporary reg came out, what, about nine months later? There was a temporary reg, that's right, and then that was followed by another regulation after that and then eventually, eight years later, a regulation that addressed specifically the duplicated loss issues here now. And so the 01 transaction took place, what, in the interregnum between the Rite-Aid decision and the temporary reg of 02? Yes, but that didn't mean there wasn't regulatory guidance in there, your honor. And our briefing makes it clear that the regulations in place then directed Duquesne Light in two respects and two specific respects as it related to the deductions in this case. And it's those regulations that create the distinction between this case and Ilfeld. So back to your first point, it's not so... You think there is a distinction? Absolutely, your honor. On the principle? On the principle, yes, on the facts and on the principle. I think the IRS's suggestion that Ilfeld applies here is a bit of misdirection when the case is unpacked and it's looked at. I don't understand that. It seems to me it's the most obvious thing that the government would say you can't take a deduction twice for the same thing. You can't get the same benefit twice. Your honor, the government absolutely does say that, but as a legal proposition that doesn't apply in this case, there was no double deduction under the regulations. I thought you admitted that the deduction for the stock was the same as that for the assets. We didn't do that, your honor. The only thing we admitted for purposes of summary judgment was to the similarity of the values. But we disagreed in two specific requests with the that the deductions were taken in violation of two express regulations and further that there was proof in Ilfeld that the losses in fact were the same and that proof was made at trial. In Pacific Lumber, there was no regulation that was contravened, right? And the Supreme Court seemed to extend the Ilfeld principle for that scenario. But in Pacific Lumber, it's the second half of this case, your honor. In Pacific Lumber, the case was tried and there was no difference of opinion on the values and no change in the asset values or the investments that produced the conclusion that it was the same economic loss. Now, on the front half of this, we have regulatory compliance also with specific directives in the regulations that did two things. I'm sorry, I guess I want to understand you. Are you saying that you haven't agreed that they're the same loss? We have not. We dispute that on both levels, your honor. They're not the same economic loss as a matter of proven fact on this record. And given the opportunity on remand, we can demonstrate why Ilfeld had deductions that were taken in specific derogation of two regulations. That was the starting point for the analysis. Then Ilfeld said, if you want another deduction, and in Ilfeld, as a matter of fact, the deductions were for the same economic loss, you're going to have to have argument that that clear statement rule has been vitiated by Gitlitz? No. Or should we apply the clear statement rule? Because if we apply the clear statement rule, it seems the question becomes, does the regulation to which Judge Ambrose adverted, the temporary regulation, does that provide a clear statement or not? I think the regulations do provide a clear statement and therefore Gitlitz is relevant. That's why we're compliant with the regulations. We're compliant with the statutory scheme. We made the exact calculation the IRS regulations required us to make. And I might add, your honor, that the losses were not disallowed on that basis. The IRS agreed with our calculations and our losses. And those regulations were intended to pick up the very duplication that Ilfeld addresses. So what did they do? They dropped Ilfeld in on top of that, declared this to be a double deduction, which historically it wouldn't be because it's regulatory compliant with specific regulatory directives. Okay, let's stop there. How is it regulatory compliant in 2001 with specific regulatory directives when supposedly the thing that I thought you were relying on no longer existed after Rite-Aid? No, what we were relying on in terms of the specific regulatory directives, your honor, was what was there in the regulations that controlled the duplicated loss issues for consolidated taxpayers. When did you do the first transaction with Lehman in 2001? I'm sorry? When did you do the first transaction with Lehman in 2001? Well, that was regulatory compliant. No, when? In January 2001, I think that was completed, or in 2001. I don't know the specific date. But it was year 2001. So you did that and that was under a reg that says you couldn't deduct a stock loss that was duplicative of an asset loss, isn't that right? And it was determined that that was not the case. And it was determined that was No, it was determined that that deduction, the first deduction, was in accordance with the regulations, was reasonable, and was justifiable. That was the stock loss under a composition of assets that was completely different than when the 2002 and 2003 asset loss deductions were taken, which is the fundamental factual difference in this case from Ilfeld. Now the IRS's formula on summary judgment doesn't account for any of this. It makes the assumption that the losses were the same without examining any of the basis or valuation of the assets. So in 2001, you deducted stock losses, correct? Based on a pool of assets, yes. And in 2002, 2003, you were deducting, with some carryback, asset losses. That's correct. And the government, so the issue before us is whether you can deduct, in effect, the 2002, 2003 asset losses. That's correct. And when you did 2002, 2003, you did have a temporary reg. I thought your argument was going to be that the temporary reg that came into effect in March or so of 2002 allowed the asset loss that you were claiming for 2002, 2003. It did. And direct me as to where it says that in the reg. So reg 1.502-80A, which is part of the temporary regulation, says you can take your deductions under 165 to the extent they're not excluded. And none of the deductions here were excluded. So I'm looking at section 1.337-D2. Right. Okay. Where are you there? Okay. So those, and by the way, this is set out in our brief at 6-8 in the opening brief in 15 and 16, and then in the reply at 12. That regulation actually is relevant to the basis calculation itself in the assets, Your Honor. And that is the controlling regulation on that point. So looking specifically post-Rite-Aid, it contained loss limitations rules that control governing the deductions first for the sale of the subsidiary stock. That's 67-FEDREG-11034-01, and that's set forth in section 1.33-D-2. Okay. Then they also provided for specific calculations for the basis in the subsidiary stock, and that is 67-FEDREG-6560-01 set forth in 1.1502-32. And what do these do that tell you that you can take the asset loss after having previously taken a stock loss? What they told us was how to deduct the asset losses under the formula provided by the IRS, which we followed. They didn't tell us anything about the stock loss because the IRS wasn't telling us anything about the stock loss, and the only reason that these deductions were condemned was based on a formula that came up after the fact. So on its face, this double deduction principle, as I said, doesn't apply because Excuse me, would you stop there? Sure. Are you saying that there was no double deduction as a matter of fact? We can prove that, yes, your honor. We never got the opportunity to do that, but there is no double deduction as a matter of law either. Now on the fact side of things, you're saying it doesn't map perfectly. There's some distinctions in the numbers, but if we look at it as a general matter, there's a double deduction, right? And that's the way it was teed up for purposes of summary judgment, for purposes of analyzing the legal issue under ILFIL. That is the way the government teed it up. You didn't say stop the presses, judge, we don't want summary judgment practice, we need two years of discovery, and we're going to get the details of all of these numbers. You didn't say that, right? We didn't, your honor, and we didn't have to, but we did say that. I know you reserved, I know you reserved the argument, not arguing saying waiver, but it went further than that, your honor. We made specific objections on the record in the tax court to their purported showing of the double deduction. Excuse me, but Judge Hardeman is asking you, as a matter of fact, was there a double deduction? Right, and as a matter of fact, there was not, and there's no proof in this record, more importantly. I'm not asking you whether there was a legal deduction. No, no, no, I understand that, your honor, and I want to say very clearly that the formula that the IRS applied to declare that this was a double deduction does not prove, as a matter of fact, that a double deduction was taken. But isn't it also true that in the tax court, the government's factual allegations are presumed to be correct, as long as there's a minimal evidence to support them? That may be part of the analysis in the tax court, but the government agreed it had the burden of persuasion on this double deduction issue, and there are no special rules on summary judgment. Is that on fact or law? On fact, your honor. They agreed they had the burden of persuasion. They say they met it with that formula, but Judge Hardeman, coming back to your point, the formula said, well, these deductions are similar in amount and approximate in time. Close enough, yes. So they're the same. It's a close enough rule. Okay. That, first of all, is not the Ilfeld standard. The Ilfeld standard is the deductions have to be taken for the same economic loss. In order to prove that in this situation, where you've got a stock loss on one group of assets in 2001 and asset losses in 2002 and 2003 with a different underlying basis of assets, you have to make a specific comparison between the values and basis in 2001 of the assets and the values and basis of 2002 and 2003 in the assets, and to do that, you have to look at the actual data underlying the transactions. I don't know. Tell us what the loss was for one and what the loss, in ordinary words, and what the loss was for the other. And why they're not duplicative. Well, so the loss in the first instance for the stock loss was determined at, I think, $190 million figure and to be lawfully taken. In the second instance, we took $250 million worth of deductions properly calculated under the regulations. It's not duplicative. Let me put it this way, Your Honor. On this record, we don't know the answer to that question, and because we don't know, a remand is required. Okay, now we're asking you, regardless of whether it needs to be remanded, regardless of who has the burden, what were the losses that were taken in a one, what were the losses taken in a two or three, and why, as a matter of fact, if you went back, you could prove that they were not duplicative as a matter of fact. Yes, so let me address that. In 2001, the stock loss was taken based on the value of the pool of assets that existed then and a basis calculation made in 2001 on that pool of assets. That's required by the regulations. Fast forward to 2002, 2003. A hundred entities have been required that are going concerns that are now added to that asset pool. The value of those entities fluctuates and it changes. It's not the same pool of assets. It's different. So when the calculation is made in 2002 and 2003 under the regulations, you have different asset bases and values that support the deduction. Now until you go back to... All you're telling us is that it's okay to do that, but you're not telling us whether they are the same or not. Whether they're duplicative. That's precisely why they're not duplicative or they're not showing to be duplicative on this record. One pool of assets... You're admitting you don't know because no one has done the deep dive into evaluating how the onset of a hundred new companies affected the asset and liability pool of this corporation. Is that what you're saying? That evidence is not in the record. It is in our records. We would come forward if given the opportunity. So you know it. In other words, it's in your records. As I sit here right now, it is in our records, but we didn't have that burden on summary judgment. That was the point. That's not the question. We're asking you facts. Yes. Facts that you would be able to prove. That's exactly right. From our records. So it's discernible, but not yet discerned. That's right. Because Discovery, remember, was cut off for purposes of hearing this motion. So we didn't develop that evidence. Let me just ask you one other quick question about the law. It's true, is it not, that prior to Rite Aid, this transaction would not have passed muster? I think there would be regulations that addressed it, but I don't know for a fact that that's true. And then after the permanent regs eight years later, this treatment would not have been allowed. You're dealing with this gap period, correct? Is that fair? I don't think it's a gap. It is the regulations permitted us to do what we did when we did it. The newly enacted regulations might disallow these deductions today if we did the tracing. So you deny that there's a conflict between the language of the temporary regulation and the intent that Treasury had? Because it seems pretty clear to me that there's a disconnect there between the intent. The intent would seem to disallow the tax treatment that Duquesne Light took here, but there's an arguable point that, well, that may have been the intent, but that's not what the language of the regulations said. Well, and I would put both of those together. It wasn't in the language of the regulations. The IRS was allowing these kinds of transactions and other instances to go through under the regs. They specifically didn't provide any different calculation in the regulations in this interim period. And that's our goddesman point, of course, Your Honor, for following those regulations. That should be addressed as the tax court didn't even purport to acknowledge on summary judgment. Well, about reasonableness. Reasonableness is an interesting issue. Do you think you think that it makes sense for a government to say you can't take a deduction for the same thing twice? I mean, you just used the word reasonableness. Let me give it back to you. Would it be reasonable for a government to say, oh, you can take the same deduction twice for the same economic loss? Is that reasonable? Well, the government certainly could provide... I would consider that to be unreasonable, Your Honor. Unreasonable? Yes. But what I think is... You're going to take a loss twice, and if you're prohibited from doing that, it's unreasonable. Well, but... Does that mean the rest of us have to pay twice? No, no, no. But I also don't think that's what I think is the proper legal issue under goddesman's reasonableness analysis. Well, goddesman only applies to penalty taxes, right? Well, that's not true, Your Honor. The penalty tax analysis in goddesman related only to the IRS's construction of the statutory scheme. The reasonableness analysis was based on the taxpayer's own evaluation of the regulations, and that was held to be reasonable because the taxpayer followed what was in the regulations, which allowed them to take the deduction that they did, precisely what happened in this case. In addition... Wait a minute, Your Honor. I don't understand that. I thought goddesman established a general rule that taxpayers are permitted to rely on reasonable, albeit incorrect, interpretations of the law in claiming deductions with respect to penalties. Goddesman's reasonableness principle is broader than that, and the tax court cases... It's a reasonableness principle that applies beyond the confines of penalty tax. And back to this intent issue. The IRS's intent was clear here. These regulations were in place. They did apply. These regulations being what? The temporary regulation and everything that operated on the duplicated loss principle that existed between right aid on the one hand and the change eight years later. So when you get back on rebuttal, then tell us where in the temporary regulation, and I'm specifically looking at 1.337D-2T, loss limitations, window period. You can tell us how these asset sales in 03-02-03 complied with that regulation then. Okay. I will. Okay. Thank you. Mr. Catterall? May it please the court. I'm Arthur Catterall of the Justice Department on behalf of the Commissioner. Can I just ask a question, just a dumb question at the outset? Why did it take until 2008 to issue a permanent regulation banning double deductions? It did not take until 2008. It took until March of 2002. What happened to the temporary reg? Which reg was pulled for a while? The reg that was pulled was a 1990 regulation that disallowed the stock loss. In March of 2002, the IRS announced here's what the replacement reg is going to do. I think those were issued maybe in proposed form in October of 2002, and I think they were finalized in 03 with a March 2002 effective date because that's when the IRS announced publicly here's what they're going to do. And what those new regulations do is they disallow the stock loss, or they suspend the stock loss. I thought the temporary reg was March of 02. Am I mistaken? March 7th of 02 or something like that? That's the effective date. Oh, okay. You said October. They came out with an announcement. Okay, got it. You can see that that temporary reg does not prevent. I think prevent is the word you use. It doesn't prevent what Duquesne Wright did here. During the gap between the period for filing for cert in Rite Aid expired, which was right at the end, and that's what they took advantage of. Why shouldn't they? Didn't they follow the rules? Is your argument that it's not enough that the gap didn't prevent them from doing this, but rather the regulation needed to expressly authorize them to do this? Is that your argument? Our argument is that when the Rite Aid court invalidated the 1990 regulation altogether, rather than on an as-applied basis, and let me explain that, the old loss disallowance regulation was invalidated as applied to a sale of stock outside the group, 100% of the stock outside the group. You mean not a subsidiary corporation? A sale of the subsidiary's stock to somebody outside the group, 100%, not 4%. The two losses, one would have been taken by the consolidated group on the sale of the stock. The second loss would have been taken by this outside person that bought the stock and then sold the assets. What the Rite Aid court said is you don't have an intra-group. Is that germane here? I thought what's germane here is that Rite Aid invalidated the regulation. There was a regulation, the 1990 reg, that would have patently precluded the tax treatment Duquesne took in this case, correct? Right. And that regulation was thrown out by the Supreme Court. By the D.C. Circuit. Right, the Federal Circuit. Right. So the reg's gone and then they go back to the drawing board. Right. And during the so-called gap, there's nothing to prevent Duquesne from doing what it did. Right. If the Rite Aid court had said this regulation is invalid as applied to this case right in front of us, which I think everybody agrees it was, when you've got a sale of stock outside the group, if they had said the reg is invalid as applied to this situation, then what we would have had is the IRS would have come out and said, okay, we're not going to apply this reg under these facts. We're going to rework the regs to comply with Rite Aid. In the interim, the reg would still be on the books. But the Rite Aid court, though, just wiped it all away. And that's why we have this gap. Right, right. And I think the point is that the 1990 regulation was perfectly valid in this context, in the intra-group loss duplication context. It was still on the books then? No, no, it wasn't on the books. So then let's forget about it. It's gone. That's where Ilfeld comes in. All right. Well, then why is this an Ilfeld case when you've acknowledged correctly, I think as you must, that there was no regulation to prevent Duquesne White's tax treatment here, but yet in Ilfeld, there was a regulation and a statute that specifically precluded what the taxpayer did in that case? So isn't that an important factual distinction between this case and Ilfeld? Okay, so Ilfeld, Ilfeld, go ahead. A coda to that is, isn't Pacific Lumber more helpful to you than Ilfeld? Yes, yes, yes. Because in Pacific Lumber, there was not any statute or regulation that prohibited it. Absolutely. Okay, so, okay, I'll say, you know, it's just been known as the Ilfeld doctrine because that's where it originated, but I'll say Pacific Lumber. All right, but then an important thing happens in 2001. The Supreme Court comes along in Gitwitz and says, you know, in Gitwitz, that's $2 million of double dipping. They take the benefit of discharged debt of $2 million and then they turn around and bump up their basis on the backside. So that's double dipping, right? And that was a statutory analysis. And what I, you know, the difference here is, you know, Duquesne is no longer arguing that section 165, which is just the general loss deduction provision, provides the, quote, clear declaration of congressional intent that you need to overcome the Ilfeld. Yeah, that's not enough. That's a general allowance. Right, right. That's why they're focusing on the reg. Right, right. And there is this, there is this gap. And again, it's there, it's a judicially created gap. Because the Treasury could have acted swiftly after Rite Aid and closed the gap, right? That's what we would have hoped to have happened, right? I mean, two months for the IRS is lightning. Well, but if there's, you know, $80 million at stake, maybe they need to, you know, work nights and weekends. I don't know. I mean, we're not dealing with a small amount of tax dollars here. And I think that's precisely the reason you have judicial overlays, I mean, to address this specific kind of situation. You mean us. Yeah, so you need us to say, with a wink and a nod, we all know what's going on here. This is unfair. And even though the reg had a gap in it, we want you to bail the, we want the judiciary to bail out the Treasury because it took them eight years to get it right. But that's not, it didn't take eight years. However many. It took two months. I mean, yeah, they. So this tax treatment was taken within a two-month period, a two-month window? December 31 of 01 is when the stock sale took place. And then two months and seven days later, the IRS announced. Well, but they didn't do anything wrong with the stock sale treatment. Your argument is they shouldn't have double-dipped with the asset treatment, which came two years later. Correct. Correct. And so, and what we're saying is, because of this gap, the gap didn't catch the first step, the stock sale. And that's where Pacific Lumber or Ilfell or whatever you want to say. What was there to catch? The stock sale, when that occurred, they treated that as required under the regulations, extant at the time, did they not? Sure. But again, what they did wrong is they sold a sliver of the stock and they backloaded all their basis into a 4% piece of the stock and sold it so that they didn't break consolidation. So they took this huge loss on the stock, but they still own the company. So they're going to get the, you know, as soon as the company sells its assets, they're getting the exact same loss. I mean, and this is what Ilfell and Pacific Lumber and National Casket and Grief Cooperage, all those cases say, can't do it. Well, let me back up to GitList. GitList appears to establish, you got to look at the text. I'm sorry? You have to look at the text, T-E-X-T. Yes, sir. And it declined the dissent's invitation to apply Ilfell. I conceded that GitList involved an S corporation, a treatment of S corporations. But GitList also repudiated the Skelly Oil case from 1969, which suggested that Ilfell applied to all tax aspects of the code. And I would agree that Ilfell has been extended beyond its original context, but we are in that context. The context of Ilfell, and all those other cases, was intra-group duplication of a parent loss and a subsidiary loss. And so basically your argument is, until the Supreme Court does something with Ilfell, it's the law with regard to intra-group deductions, period. Sure. Yeah, particularly when you have this judicially created two-month gap. I mean, this is exactly the type of situation that Ilfell and Pacific Lumber should apply as a backstop, because you've got this strange two-month gap. And so then the question we kept asking Mr. Martin, and I'm not sure we got the answer, is how factually were the asset sales that took place in 2002-2003 duplicative of the stock loss deduction that was taken in 2001? Well, let me just clarify that Duquesne has never disputed the fact of loss duplication. They may quibble with the exact amount, but they don't dispute the fact. I mean, if you look at page 40 of their brief. They stipulated that for purposes of summary. Okay, I just want to make that clear. But they want to quarrel about the numbers and say, well, we're entitled to a remand so we can work through those numbers. Why are they wrong on that? Well, in their reply brief, on page 14 of their reply brief, they say the IRS argues that it met its burden by reciting the amounts and timing of the losses and the proximity in time between the losses, and they cite to page 26 of our brief. If you look at page 26 of our brief, you'll see that Duquesne has left out a very significant fact that we recited. And that is, it's undisputed that the Duquesne group claimed $509 million of AquaSource-related deductions or losses based on a net investment, and that's capital contributions to AquaSource, less distributions from AquaSource, a net investment of $281 million. So $509 million of losses claimed on a $281 million investment. We know that that's undisputed because those figures come from an exhibit to Duquesne's motion. So I think that's a pretty good factual indication that these are duplicated losses. So, and if I may, do your honors want to get into the statute of limitations? I mean, I know it's a... Unless my colleagues do. No. Okay. Well, again, I think basically what Duquesne is essentially arguing is that when the IRS issued this disallowance reg back in 1990, they basically preempted Ilfeld in this context forevermore. So that when the Rite Aid court came and invalidated the regulation altogether so that you had this void, this gap, they're saying that even though the regulation, the preemptive regulation is gone, it's alleged preemptive effect remained completely intact so that courts could not rely on Ilfeld to curb this kind of abuse during this two-month interregnum. And again, I think it's kind of ironic because... Are there any other cases, by the way, that are currently pending about the applicability of Ilfeld during the gap? Yeah. Not to my knowledge. This is a one-off. This is, well, yeah, Thrifty Oil, I guess, and then this. Yeah, Thrifty Oil. Not to my knowledge. I'm not aware. Mr. Ketterer, is there any case that you could cite where the company fully complied with the relevant statutory and regulatory guidance but was nevertheless assessed a deficiency under Ilfeld? Well, I think if you go back to Pacific Lumber, they complied with, you know, Section 165 says you get a loss when you sell something. You know, you get a loss deduction when you sell an asset or stock at a loss. And there was nothing in the regs at that time because... So the regs were silent. The statute had the general allowance provision, but the regs, there was regulatory silence. And they have something better than that here, don't they? They have a temporary reg that would seem to authorize what they did. I mean, if the temporary reg said something like, you know, until we fix this, full speed ahead. You do whatever, you know, you can take a stock loss. You can take a loss without breaking consolidation and then sell the assets and take the loss again. I mean, if the reg had been clear about that, you know, maybe they'd have a point. Their whole point is that all the temporary reg had to say the 1990 regulation that was invalidated by the Federal Circuit in Rite Aid is reissued except we make clear that it only applies to parent subsidiary regulations. That's all they had to say. Well, that's what they did. And basically, you know, they waited two months after, you know, the Rite Aid decision became final to make the announcement. Can I just ask you to interpret the temporary reg for me, if you would? The one that came out of March 7, 2002. It's 1.337D-2T. A, general rule. No deduction is allowed for any loss recognized by a member of a consolidated group with respect to the disposition of stock of a subsidiary. Then it goes down to two. Loss is not disallowed under A-1 of this section, which I just read. And basis is not reduced under paragraph B-1 to the extent that the taxpayer establishes that the loss or basis is not attributable to the recognition of built-in gain on the disposition of an asset, including stock and securities. What do you interpret that to mean? I interpret that to, that's looking at the general way these cases usually play out, is that the losses were taken, the subsidiary losses, the asset losses were taken first. And then the stock was sold outside the group. And I think what that regulation is saying, it's assuming that that's the order of the transaction. If you've had all these subsidiary losses beforehand and now you're selling the stock, whereas the old regulation said no loss, now we're going to let you prove. So you're saying two deals with Rite Aid, in effect? I'm sorry? You're saying two deals with Rite Aid, the losses? Yeah, I think sort of indirectly. And again, I think it assumes the usual order of things. And that is that, you know, that the losses, the asset losses happen first, and then you sold the stock outside the group. Okay. Any further questions? Thank you very much. So looking first at the homework assignment that I got when I went back to the bench, the temporary regulation directed the taxpayer to apply 1.502-20 without the duplicated loss provisions in it. There was no mention of ill-filled in the preamble. It said that's where you go. So at this point, you're talking about dispositions and deconsolidations prior to March 702? And then after, without mentioning ill-filled, we were directed by the regs to apply regulation 1.502-20 to the deductions. Then that did take us, Your Honor, to the regulations I mentioned before, including the one that you highlighted, which is 1.337-D2. Now, we took the formula in that section, which was intended to be the duplicated loss provision now applicable, which covers the ill-filled situation. And that prescribed a formula in a series of steps. We followed those steps, and the record reflects that the IRS agreed that we did that. Okay, now let's go to Judge Hardiman's question. You're allowed during the gap period to take a loss for stock. Post-temporary regulation coming into effect on March 7, 2002, you do two transactions relating to assets, and also attempt to take losses with respect to the disposition of those assets. Yes. And you're saying that, are you saying first that the temporary regulation allows that, and therefore it supplants ill-filled, or what? So the temporary regs set up the formula. We followed the formula, acted reasonably in doing that, and so ill-filled does not... That's a general... I'm asking a specific question. Ill-filled does not now enter the equation under our analysis of the case. And what in the temporary reg specifically allows you in an intra-group situation to say that we can do an asset disposition, take the losses, and it's okay under this reg? It didn't specifically say that, but it didn't have to. It had the formula, and we followed it. So you only need a specific provision according to ill-filled. If you're acting contrary to the regulations, we were not. If the reg was, in effect, superseding or overruling ill-filled, don't you think something in the reg would have said that? For an intra-group situation? It didn't say otherwise, Your Honor. It directed us to follow this. So actually, it's better than that. And that's, of course, what brings Gottesman into play. And Gottesman is not a penalty tax case. Applied research tells us that. Finally, on this McLaughlin notion, McLaughlin was a trial... So you're saying anything I do that's reasonable, I can be incorrect, but it's okay. I can rely on it in order to get... That's taking it a bit far, isn't it? I think in this context, in particular... I mean, I could just say I could do a lot of things tax-wise that are reasonable. One of my former partners used to say, the one thing you know with the tax code is you park your reason at the door. Right. So let me park my point on this with the Woods investment case. The Woods investment case is the tax court saying, pay attention to these consolidated return regulations. They control in this situation, not McLaughlin, not ill-filled. And when you act in compliance with them, we don't want to hear from the IRS that they want more for a provision that they didn't enact or that you... So the point is, I'm in good company here in making this point. If the IRS wants additional regulatory guidance, if they want that, they have to enact it. But the regulatory guidance that they're... If the taxpayer follows it reasonably, that's what they're supposed to do. And it should be allowed. What in the temporary... I'm going to ask you one more time. What in the temporary reg that went into effect in March of 02 allows in an intra-group situation the deduction for the asset losses that you claimed in 02-03 after having taken stock losses in 01? The formula in the regulation that I pointed you to allows for the deduction... In what, 1.50220? 1.337D provides the formula that we follow. And the IRS, Your Honor, I will reinforce again... And where in D are you relying on that? Are you relying on two of the... Well, the regs, yeah, they prescribe the formula, which is a series of steps to determine the amount of disallowed losses. And that's what we follow. That's what the record reflects. And the IRS, I want to make the point again, did not disallow any of the losses on the basis that we followed the formula. They agreed with our basis calculations. They stipulated to them. And then, as I said, they dropped Ilfeld in on top of that... Well, you think the Ilfeld principle trumps what the regs told you to do, right? But Ilfeld itself is a regulation statute-specific case. It's an interpretive principle. It is not some free-floating license for the IRS to come in after the fact with a formula that they gave no notice to the taxpayer of and declare a regulatory-compliant set of deductions to be a violation. That's not Ilfeld. It's not close. That's not Skelly. It's not close. And Wood's investment establishes that the IRS can't do that. Again, we're in good company here. Gitlitz says they can't do that. This court's own precedents say fidelity to the code is important. And that's what brings Gottesman into play here. That's why our fairness stance is important. And on the statute of limitations, I'll just say that their construction doesn't hold up under the plain language of the statute. And at the very least, apart from the remand on Gottesman and on the calculation of the same economic loss, that $59.6 million deduction that was disallowed needs to come back. Thank you very much. Thank you to both counsel for well-presented arguments. We'd ask that counsel get together and have a transcript of this argument prepared and split the cost, please. But we'll do that. Thank you very much.